1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LUIS LOPEZ ARRIAGA,

11          Petitioner,                No. CIV S-04-1293 LKK DAD P

12      vs.

13   JEANNE WOODFORD, et al.,

14          Respondents.              FINDINGS & RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a judgment of

18   conviction entered against him on May 31, 2004, in the El Dorado Superior Court on charges of

19   attempted first-degree murder with personal use of a firearm.  He seeks relief on the grounds that

20   the admission of his involuntary confession into evidence at his trial violated his Fifth

21   Amendment privilege against self-incrimination and his Fourteenth Amendment right to due

22   process.  Upon careful consideration of the record and the applicable law, the undersigned will

23   recommend that petitioner's application for habeas corpus relief be denied.

24   /////

25   /////

26   /////

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

Defendants Luis Lopez Arriaga and Silvestre Garcia Gonzalez were convicted of two counts of attempted murder, and the jury found that the crimes were willful, premeditated, and deliberate (Pen. Code, §§ 187, 664, subd. (a); further section references are to the Penal Code unless otherwise specified). As to each offense, the jury found that Arriaga personally used, personally discharged, and caused great bodily injury with, a firearm (§§ 12022.5, subd. (a)(1); 12022.53, subds. (a) - (d) and that Gonzalez was armed with a firearm (§ 12022, subd. (a)(1)).

For each of his convictions, Arriaga was sentenced to state prison for life with the possibility of parole, plus 25 years to life for the firearm enhancement, the terms to run consecutively. For each of his convictions, Gonzalez was sentenced to prison for life with the possibility of parole, plus one year for the armed enhancement, the terms to run consecutively.

On appeal, defendants raise numerous claims of error. Among other things, they contend the trial court erred in instructing on transferred intent. The People properly concede the error but argue it was harmless. We conclude the erroneous transferred intent instruction was prejudicial with respect to the convictions and special findings on count two, the attempted murder of Matthew Hunt. Therefore, we must reverse those convictions and findings. We otherwise find no reversible error and thus shall affirm the convictions and special findings on count one, the attempted murder of William Hunt.

FACTS

While deer hunting with his eight-year-old son, Matthew, and four-year-old son, Riley, William Hunt heard a shot and was hit in the left wrist and arm by a shotgun blast.[2] As he turned to look for the boys, he heard a second shot and was struck in the midsection. He then saw that Matthew had been shot in the forehead and face and was lying prone.

Shortly after the shots were fired, defendant Arriaga and his son, Mario Lopez, came down the hill. Arriaga was carrying a shotgun and looked angry. Lopez appeared upset. The men helped

---

[1] The following summary is drawn from the January 22, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-4, filed in this court on August 20, 2004. See lodged document entitled "Unpublished opinion by the California Court of appeal, Third Appellate District, Case No. C038855."

[2] For simplicity and to avoid confusion, we hereafter will refer to the Hunts by their first names.

William and the boys down the hill to William's truck.  William, an emergency medical technician, was able to provide preliminary care to himself and Matthew.  He then got into his truck and began honking the horn.  William's brother, Donald, who was hunting in a nearby area, heard the horn and responded.  Donald drove the truck out to the highway, where they came upon a forest service crew.  The crew provided first aid while emergency transportation was arranged.  Both victims survived.

The mountain property on which the Hunts were hunting is a large parcel known as the Davis property.  It is held in a trust established for the benefit of the trustors' grandchildren.  William and Donald are among those grandchildren.  The Hunts also have access to a contiguous parcel, known as the Bacchi property, owned by relatives of the Hunts.

Defendant Gonzalez, who was married to a sister of William and Donald Hunt, had spent time on the properties with his wife.  An investigation revealed that Gonzalez used the properties for the surreptitious cultivation of large amounts of marijuana.  About a month before the shootings, law enforcement agents had found and destroyed three large gardens on the Bacchi property.  It is apparent, however, that they did not discover and eradicate all of the marijuana being grown in the area.

Defendant Arriaga's son, Mario Lopez, testified that during the summer before the shootings, Gonzalez hired Arriaga to stay on the property in order to tend and guard the marijuana gardens.  Gonzalez gave Arriaga a shotgun and told him to shoot anyone that came near the marijuana.  (Lopez attempted to describe the comment as a joke and said that Gonzalez had been drinking at the time.)  Another of Arriaga's sons, Arturo Lopez, testified that he heard Gonzalez tell other workers to shoot anyone who came near the marijuana.

From time to time, Mario Lopez would give Gonzalez a ride to the property.  On a couple of occasions, Mario took his sons there to fish in the lake.  Mario and his sons went to the property on the day of the shootings.[3]  As Mario approached the area where Arriaga was, he heard a gunshot and then, seconds later, heard another.  He ran to where the shots came from and saw William, wounded and sitting on a log.  He saw Arriaga nearby with a shotgun.  Mario told Arriaga to drop the gun and, at Mario's direction, they helped the victims.

/////

[3]  Mario testified that Gonzalez had asked for ride [sic] to the property on the morning of the shootings.  However, when Mario arrived at Gonzalez's home, he did not appear to be there. Mario assumed that Gonzalez had gotten another ride to the property, so Mario and his sons drove there without him.

3

After the shootings, both defendants fled from the region. Gonzalez ultimately was located and arrested in Rohnert Park, Sonoma County.  Arriaga was located and arrested in Sunnyvale, Santa Clara County.  We later will note other aspects of the evidence to the extent relevant to our discussion of the issues presented.

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

4

1  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

2  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

3       The court looks to the last reasoned state court decision as the basis for the state

4  court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state

5  court reaches a decision on the merits but provides no reasoning to support its conclusion, a

6  federal habeas court independently reviews the record to determine whether habeas corpus relief

7  is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

8  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

9  reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

10 AEDPA's deferential standard does not apply and a federal habeas court must review the claim

11 de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

12 1167 (9th Cir. 2002).

13 II.  Petitioner's Claim

14       The sole claim presented in the habeas petition before this court is that the

15 admission into evidence at petitioner's trial of his involuntary confession to police violated his

16 Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment right to

17 due process.  The California Court of Appeal fairly described the background to this claim as

18 follows:

19       After Arriaga's arrest in Sunnyvale, detectives attempted to
        question him with the assistance of a bilingual Sunnyvale police
20      officer.  When his rights were explained, Arriaga – who spoke only
        Spanish – said what has been translated as "Mm.  No, no[.]  I don't
21      know anything about that.  I'm not going to say anything."  In a
        discussion between the interviewers, the Sunnyvale officer stated:
22
        "He's – he's saying he doesn't – he doesn't know.  He's not talking
23      about his rights.  I think he doesn't understand what's going on
        right here."  The lead investigator, Detective Hoagland, then said:
24      "We're not going to wait.  He's been advised of all his rights."

25      Upon questioning, Arriaga insisted he did not know anything and
        did not do anything.  The detectives told Arriaga that Mario Lopez
26      was in jail and that "[i]f you don't tell us the truth, Mario is going

                                          5

to stay in jail." During the interview, Arriaga was visibly upset. In the hope of calming him down, the detectives arranged for him to talk by telephone with Lopez, who had promised to help the investigation if he could.

In the telephone conversation, which was recorded, Lopez urged Arriaga to tell the truth. At one point, Arriaga said what has been translated as: "The attorney. Where is he?"[4] Lopez said: "Well, what attorney. There's no attorney yet. Here they're going to give me one." He added: "You understand? You get one here." Hoagland testified that Arriaga was mumbling in this conversation and the officers could not hear what he was saying. They did not understand that he had made reference to an attorney, and Lopez did not advise them that he had done so. When the trial court asked Lopez whether he thought that Arriaga was saying he wanted an attorney before the police talked to him further, Lopez replied "I don't know."

After the telephone conversation, the detectives questioned Arriaga further. He continued to say he was not at the scene of the shootings and knew nothing of the crimes. The interview was terminated.

Three days later, Arriaga had been transported to El Dorado County and Lopez had been released from jail. The detectives arranged for Lopez to meet with Arriaga at the jail. Lopez was told he should not make any promises or threats. The detectives simply wanted Lopez to tell Arriaga that he would not be hurt and to urge him to tell the truth. Lopez did so. Lopez asked, "Do – do you want to talk to them? Tell the truth?" Arriaga replied, "yes, well, that would be better." Arriaga was then advised of his rights and affirmed that he understood them. In the subsequent interview, he discussed the offenses.

The trial court excluded the first interview for two reasons. The court interpreted Arriaga's statement that he was not going to say anything to be an invocation of the right to remain silent and, in any event, the court concluded the Sunnyvale police officer's comment that he thought Arriaga did not understand what was going on precluded a determination that Arriaga made a knowing and intelligent waiver of the right to remain silent.

However, the trial court denied the motion to exclude the second interview. The court reasoned that Arriaga had not invoked the right to counsel. Unlike the invocation of the right to counsel,

---

[4] In advising Arriaga of his <u>Miranda</u> rights the Sunnyvale police officer referred to an attorney as "abogado." Lopez also used that word in his testimony. However, in the telephone conversation with Lopez, Arriaga used the word "licenciado." It was not established whether the Sunnyvale police officer would have understood "licenciado" to refer to an attorney.

1
2
3

> when a suspect invokes only the right to remain silent then
> subsequent interrogation may be permissible. (See People v.
> DeLeon (1994) 22 Cal.App.4th 1265, 1272; People v. Warner
> (1988) 203 Cal.App.3d 1122, 1129-1130.) The court found this to
> be such a circumstance.

4    (Opinion at 16-19.)

5            Petitioner claims that his police interrogators repeatedly violated the dictates of

6    Miranda v. Arizona, 384 U.S. 436 (1966), when they questioned him about the shootings, both at

7    the first interrogation on October 11, 2000 at the Santa Clara County jail and also at the second

8    interrogation on October 14, 2000 at the El Dorado County jail. (Pet. at 7- 12.) Petitioner also

9    argues that his telephone conversation with Mario Lopez was effectively a "police interrogation"

10   and that all of his statements made to Lopez were coerced and involuntary and should have been

11   suppressed. (Traverse at 4.) Petitioner further claims that his Sixth Amendment right to counsel

12   was violated during the police interrogation when he requested an attorney and was informed by

13   Lopez that he couldn't have one until he arrived at the El Dorado County jail. (Id. at 7-8.)

14   Finally, petitioner argues that his "coerced and involuntary statements" had a "substantial and

15   injurious effect" on the verdict for the following reasons:

16
17
18
19

> Absent the coerced statements, the jurors might have found
> Mario's self-serving and blame-shifting version unbelievable – and
> there was precious little to support the verdict other than Mario's
> testimony. Furthermore, Petitioner's confession was the
> centerpiece of the State's case, the focal point of the prosecutor's
> summation, and had no equivalent in the other evidence in this
> case.

20   (Pet. at 12.) In the traverse, petitioner makes the following additional argument regarding the

21   prejudice flowing from the alleged constitutional violation:

22
23
24
25
26

> The Miranda opinion and its progeny do not carve out exceptions
> to the exclusionary rule clearly set forth in Miranda. Once it was
> determined that Mr. Arriaga's statements were obtained in
> violation of Miranda, the analysis ends and the Court should have
> deemed the admission of those statements as reversible error. For
> the Court to conduct an analysis as to the its [sic] perceived
> prejudice was improper. Notwithstanding same, it defies logic to
> conclude that statements made by Mr. Arriaga which amount to
> confessions and/or admissions as to his involvement in the subject

7

1  crimes were not prejudicial.  The admission of the confessions are
   prejudicial per se.

2

3  (Traverse at 11.)

4        On appeal from the judgment of conviction the California Court of Appeal

5  rejected petitioner's challenges to the admission into evidence of his confession, finding that any

6  error was harmless.  The appellate court reasoned as follows:

7        Arriaga levels a broad-scale challenge to the introduction of
        statements he made during the second interview.  In this rare
8        instance, we deem it appropriate to bypass consideration of the
        admissibility of the statements and, instead, assume error and
9        proceed to an assessment of prejudice.

10       In People v. Cahill (1993) 5 Cal.4th 478, the Supreme Court
        considered the standard for determining whether the erroneous
11       admission of a coerced confession requires reversal.  When the
        error amounts to federal constitutional error, its effect must be
12       assessed under the beyond-a-reasonable-doubt standard explicated
        in Arizona v. Fulminante (1991) 499 U.S. 279, at pages 306 to 312
13       [113 L. Ed.2d 302, 329-333].  (People v. Cahill, supra, 5 Cal.4th at
        p. 510.)  The error is not reversible per se.  (Id. at p. 509; see also
14       People v. Sims (1993) 5 Cal.4th 405, 447-448).

15       Under the circumstances of this case, we are satisfied beyond a
        reasonable doubt that the introduction of Arriaga's statements
16       during the second interview was harmless.

17       In his statements, Arriaga admitted that he was the shooter.
        However, even in the absence of that admission, the evidence was
18       simply overwhelming that he was the shooter.  (See People v.
        Sims, supra, 5 Cal.4th at p. 448).  William positively identified
19       Arriaga as the man who came out of the bushes holding a shotgun
        immediately after the shootings.  Donald testified that Arriaga was
20       definitely the older man present at the scene, with Mario Lopez.
        And Mario testified to Arriaga's participation in the marijuana
21       growing operation and perpetration of the shootings.

22       In view of this evidence, and in the absence of any contrary
        evidence, any reasonable jury would have been compelled to find
23       that Arriaga was the shooter.

24       Moreover, Arriaga's statement was otherwise fully or partially
        exculpatory.  And it provided the foundation for defense arguments
25       to the jury.

26  /////

                                        8

First, based primarily upon Lopez's meeting with Arriaga, in which he urged Arriaga to talk, defense counsel constructed an argument that Lopez was the actual shooter and had convinced Arriaga to take the blame. While that argument was speculative at best, it found its primary support in the admission of the second interview.

Second, the claims of self-defense or imperfect self-defense rested primarily upon Arriaga's extrajudicial statements. In his somewhat conflicting testimony, Lopez said (1) Arriaga was very angry because he believed that some of the marijuana had been surreptitiously harvested and was awaiting removal; (2) therefore, Arriaga staked out the area awaiting the return of the culprits; (3) Arriaga saw William carrying a rifle and walking all around; and (4) fearing he might be shot, Arriaga fired first. Because Lopez's testimony describes nothing more than an ambush shooting by a person guarding a clandestine marijuana operation, it does not tend to establish the element of immediacy that is essential to claims of self-defense or imperfect self-defense. "Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury." (In re Christian S. (1994) 7 Cal.4th 768, 783.) In contrast, Arriaga stated in the second interview that William had raised his rifle to a shooting position and was going to shoot at Arriaga before he, Arriaga, shot William. Thus, Arriaga's interview was the only evidence tending to establish that he perceived imminent danger before shooting.

Third, Lopez's testimony that Arriaga had staked out the harvested marijuana and watched the man with the gun walking all around before the shooting suggests Arriaga had ample opportunity to perceive that William was accompanied by his sons and, thus, placed them in a "kill zone" when he shot. But in Arriaga's statement, he repeatedly and adamantly insisted he did not see the boys and would not have shot had he done so. Therefore, it was Arriaga's extrajudicial statement that raised the question whether he intended to kill Matthew.

For these reasons, we are satisfied beyond a reasonable doubt that the introduction of Arriaga's extrajudicial statement helped him more than it hurt him. Absent Arriaga's statement, there was overwhelming evidence he shot William and Matthew. Consequently, his statement provided the primary evidentiary basis for virtually all of the defense arguments. While those arguments were not successful at trial, Arriaga's extrajudicial statement compels the conclusion that the transferred intent instruction was prejudicial with respect to his conviction for the attempted murder of Matthew. Hence, introduction of the statement did not harm Arriaga.

(Opinion at 19-22.)

1       The Constitution demands that confessions be made voluntarily.  See Lego v.

2  Twomey, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict

3  criminal defendants because they are inherently untrustworthy and because society shares "the

4  deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life

5  and liberty can be as much endangered from illegal methods used to convict those thought to be

6  criminals as from the actual criminals themselves."  Spano v. New York, 360 U.S. 315, 320-21

7  (1959).  A confession is voluntary only if it is "'the product of a rational intellect and a free

8  will.'"  Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372

9  U.S. 293, 307 (1963)).  See also Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  "The line of

10  distinction is that at which governing self-direction is lost and compulsion, of whatever nature or

11  however infused, propels or helps to propel the confession."  Collazo v. Estelle, 940 F.2d 411,

12  416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).

13       In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme

14  Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory,

15  stemming from custodial interrogation of the defendant unless it demonstrates the use of

16  procedural safeguards effective to secure the privilege against self-incrimination."  To this end,

17  custodial interrogation must be preceded by advice to the potential defendant that he has the right

18  to consult with a lawyer, the right to remain silent and that anything stated can be used in

19  evidence against him.  Id. at 473-74.  Once Miranda warnings have been given, if a suspect

20  makes an unambiguous statement invoking his constitutional rights, "all questioning must

21  cease."  Smith v. Illinois  469 U.S. 91, 98 (1984).  See also Miranda, 384 U.S. at 473-74;

22  Michigan v. Mosley, 423 U.S. 96, 100 (1975).

23       Where an involuntary confession is improperly admitted at trial, a reviewing court

24  must apply a harmless error analysis, assessing the error "in the context of other evidence

25  presented in order to determine whether its admission was harmless beyond a reasonable doubt."

26  Arizona v. Fulminante, 499 U.S. 279, 308 (1991).  See also Sims v. Brown, 425 F.3d 560, 571

1   (9th Cir. 2005), cert. denied ___ U.S.___, 127 S. Ct. 62 (2006).  In the context of habeas review,

2   the standard to be applied is whether the error had substantial and injurious effect or influence in

3   determining the jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Henry v.

4   Kernan, 197 F.3d 1021, 1029 (1999).[5]  Thus, the Ninth Circuit has stated:

5          We "review the evidence at trial to determine whether the
           confession likely had a substantial and injurious impact on the
6          verdict; if not, its admission was harmless."  Taylor v. Maddox,
           366 F.3d 992, 1016 (9th Cir.2004) (citing Brecht v. Abrahamson,
7          507 U.S. 619, 637-39 (1993)).  "If a habeas court is left with 'grave
           doubt' about whether a constitutional error substantially influenced
8          the verdict, then the error was not harmless."  Parle v. Runnels, 387
           F.3d 1030, 1044 (9th Cir.2004) (citing O'Neal v. McAninch, 513
9          U.S. 432, 438 (1995)).

10  Sims, 425 F.3d at 570 (parallel citations omitted).  Nonetheless, this analysis must be conducted

11  with an awareness that "a confession is like no other evidence," and that "a full confession may

12  have a 'profound impact' on the jury."  Fulminante, 499 U.S. at 296.  See also Henry, 197 F.3d at

13  1029-30.

14          As explained above, the California Court of Appeal concluded that any error in

15  admitting petitioner's confession into evidence at trial was harmless.  In order to grant habeas

16  relief where a state court has determined that a constitutional error was harmless, a reviewing

17  court must determine: (1) that the state court's decision was "contrary to" or an "unreasonable

18  application" of federal law with respect to harmless error, and (2) that the petitioner suffered

19  prejudice under Brecht as a result of the constitutional error.  Inthavong v. LaMarque, 420 F.3d

20  1055, 1059 (9th Cir. 2005) (concluding that the decision of the state appellate court, that any

21  error in the admission of petitioner's confession in his murder trial was harmless beyond a

22

23          [5] "[I]n § 2254 proceedings a federal court must assess the prejudicial impact of
24  constitutional error in a state-court criminal trial under the 'substantial and injurious effect'
    standard set forth in Brecht [v. Abrahamson], 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d
25  353[(1993)], whether or not the state appellate court recognized the error and reviewed it for
    harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v.
26  California], 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [(19670]."  Fry v. Pliler, ___ U.S. ___,
    127 S. Ct. 2321, 2328 (2007).

1  reasonable doubt, was objectively reasonable).  See also Mitchell v. Esparza, 540 U.S. 12, 17-18

2  (2003) (when a state court determines that a constitutional error is harmless, a federal court may

3  not award habeas relief under § 2254 unless that harmlessness determination itself was

4  unreasonable).  Both of these tests must be satisfied before relief can be granted.  Inthavong, 420

5  F.3d at 1061.

6           Assuming arguendo that the state trial court erred in allowing into evidence

7  petitioner's statements made during his telephone conversation with Mario Lopez and the

8  October 14, 2000 police interrogation, petitioner has failed to demonstrate that the error

9  prejudiced him in any way.  As explained by the state appellate court, William Hunt positively

10  identified petitioner as the man carrying the shotgun immediately after the shootings and Donald

11  Hunt testified that petitioner was the older man present at the scene as they attempted to save

12  Matthew Hunt.  (Reporter's Transcript on Appeal (RT) at 92, 109-110, 592-95.)   Finally, Mario

13  Lopez testified in detail as to petitioner's involvement in the shootings, explaining that

14  immediately upon hearing the shots he ran to the scene and found his father (petitioner) holding

15  the shotgun in close proximity to the wounded William Hunt.  (RT at 442-44, 446-48.)  Mario

16  Lopez testified that when asked what had happened petitioner responded that "the man was going

17  to shoot him."  (Id. at 444.)  Standing alone, this testimony overwhelmingly established that

18  petitioner was the person who shot the Hunts.  Moreover, as explained by the state appellate

19  court, the statements made by petitioner during his confession in fact formed the basis of the

20  theory of petitioner's defense at trial, including his arguments with respect to his actual

21  innocence and his claim that he acted in self-defense.  (Id. at 744-47, 747-49, 754-57.)  Under

22  these circumstances, the admission into evidence of petitioner's statements to the police could

23  not have had a substantial and injurious effect on the verdict.  Brecht, 507 U.S. at 637.  The

24  conclusion of the California Court of Appeal that any error in admitting petitioner's

25  incriminating statements was harmless was not contrary to or an unreasonable application of

26  /////

1   Brecht.  Accordingly, petitioner is not entitled to relief on the claim before this court.  Esparza,

2   540 U.S. at 17-18; Sims, 425 F.3d at 572; Inthavong, 420 F.3d at 1059.

3                                                    CONCLUSION

4              For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

5   application for a writ of habeas corpus be denied.

6              These findings and recommendations are submitted to the United States District

7   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8   days after being served with these findings and recommendations, any party may file written

9   objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within ten days after service of the objections.  The parties are advised

12  that failure to file objections within the specified time may waive the right to appeal the District

13  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14  DATED: May 21, 2008.

15

16                                                    _____

17                                                    DALE A. DROZD
                                                     UNITED STATES MAGISTRATE JUDGE
18  DAD:8
    arriaga1293.hc
19

20

21

22

23

24

25

26